Good morning. May it please the Court, Timothy Garrison, Federal Defender of San Diego, on behalf of Mr. Martinez-Avina. There are three reasons why this conviction should be reversed, Your Honors, and there's three more reasons why, if the conviction is not reversed, then the sentence should be reversed. First of all, with regards to reversal of the conviction, the conviction should be reversed because the District Court allowed improper evidence regarding the modus operandi. I might not have let it in myself if I'd been a district judge. I don't know, I don't much like the experts testifying about how things are generally, but I have trouble seeing why it's outside the discretion of the district judge, and I have even more trouble understanding why any error here, any abuse of discretion, isn't harmless. The harmlessness is the really tough part for me. It's hard to see where it mattered. Could you address that? Yes, Your Honor. With regards to the first question, the cases that have dealt, the Ninth Circuit cases that have dealt with this, with these issues of modus operandi of drug couriers and drug courier profile evidence, have repeatedly stated that it's under four or three grounds, it's more prejudicial than prohibitive, and that dovetails right into the harm. That has to depend on the facts of the individual case, though. Correct, Your Honor. Here, secret compartment in the car, 87 pounds of dope bag going across the border. This Court has held that this type of evidence should only come in in certain circumstances, not in a simple border bus case. Some of it sounded stupid, too, I mean, really stupid. Like, the expert says, oh, they have an air freshener in their car. That shows they're dope dealers, because the dope dealers all have air fresheners in their car. And I'm thinking, I walk through the parking lot at Safeway, everybody else has an air freshener hanging on the pickup truck mirror, too. It's just stupid to draw much of an inference, and that's part of why I'm thinking that it's harmless, letting it in. Actually, Your Honor, that goes directly to why it is not harmless. It's because the reason that this evidence is an abuse of discretion to let it in, except in the specified circumstances that the Court has set out in cases like Vallejo and Murillo, the reason that it's so harmful to let it in is because it attributes guilt and infers guilt from innocuous activity. Only if nobody on the jury ever walked through the Safeway parking lot and noticed all the air fresheners on everybody's pickup truck. Well, Your Honor, that's exactly why. There are many people who have these innocent... Your argument is not showing prejudice. Your argument is showing that it's a weak inference. But what I'm raising for you is, why isn't the weakness of the inference as obvious to the jury as it is to you, and why doesn't that make the error harmless? Well, first of all, because it was coming from experienced Customs and Border Protection officers who were saying, this is a typical characteristic of a drug courier to have this. So even though to the jury it may appear, well, yeah, I walked through the Safeway parking lot and I see a ton of air fresheners on cars, what they're getting is extra information, specialized knowledge from a United States officer saying, although a lot of people may have them, drug couriers always have them, or most likely have them in a very high number of cases. Now, where it goes to prejudice is that in this case there was no dispute that this was marijuana. Knowledge of the marijuana was the central issue before the jury. And in cases like Vallejo, the court has said that to allow this evidence in, a case where knowledge is the central issue, shows that there is prejudice because basically the government sought to infer knowledge from these innocent activities. Tell me on the other innocent activity, the keys, what was the deal? Did Martinez-Avina not have any house keys at all, or did he just have his house keys separate from the keys for, I can't remember if it was a pickup truck or a car anymore. It was a car, Your Honor. The record doesn't say where Mr. Martinez' house keys were. Mr. Martinez' testimony at trial was that he was taking the car to get it smog checked, and so the owner of the car had given him these two keys that went specifically to the car. Once again, something that a lot of people would detach their keys. I'm thinking if you've got 12 people on the jury and some cop is telling them, oh, people who have their house keys separate from their car keys, they're dope dealers, you get three or four people on the jury at least who have their house keys separate from their car keys. So the government hurts itself instead of helping itself, and at the very least it's not prejudicial. Well, Your Honor, I have my house keys separate from my car keys, and it's not so I can deal dope in my car. It's to avoid putting a lot of weight on the receptacle where you put the car key. Your Honor, the argument is that once the government has attributed these seemingly innocent activities and seemingly innocent characteristics to drug couriers and inferred to the jury that these connote a drug courier, then at that point a person, the juror, has additional information besides their everyday experience that maybe I carry my keys with me. And plus, if the court takes a divide-and-conquer approach to... So the government is using Groucho Marx's argument. Are you going to believe me or are you going to believe your own lying eyes? No. No, the government is going above and beyond. The government in presenting this evidence to the jury is going above and beyond what a regular lay person's normal experience, a regular juror's normal everyday experience is. Everyday experience doesn't include air fresheners and how you carry your house and car keys? It does, but specialized, it's the specialized knowledge that goes above and beyond that, Ladies and gentlemen of the jury, when you have two car keys on the key ring and air freshener in there, that connotes the modus operandi of a drug courier. At that point, they're receiving additional information, Your Honor. They're receiving information that these things that are innocent to the normal eye, to the lay person's eye, through the lens of the federal law enforcement, the Customs and Border Protection officers and the ICE agents that deal with this every day, when they see it, at that point, they've got additional, the government's attempting to show them additional information to infer. But this wasn't the only evidence the government presented, was it? No, it wasn't, Your Honor. There was substantial evidence about his involvement in this. Yes. Yes, there was. And most of that evidence was uncontested. The government's agents, with regards to the background of the story, everything pretty much matched up from the defendant's account to the government's account, where the credibility came into, where it basically came down to credibility determination between the defendant and the government. Where that really came into was whether or not this was a coerced confession, whether or not Mr. Martinez-Avina had denied knowledge and subsequently then admitted once his legal permanent residency status was threatened. So that was really the bone of contention here. Mr. Martinez-Avina's theory of the case and his contention was that he did not know drugs were in the car. However, at the time, after a prolonged amount of interrogation by multiple agents, I think there were five or six agents in the interrogation room surrounding him, the fact that the case agent on the case stood up, raised his voice, threatened his lawful permanent residency card, at that point his will was overborne and he confessed to, he said that he did know that the marijuana was in the car when originally he had denied knowledge. So it was really a credibility determination between the jury had to decide if they believed the government, if they believed specifically Agent Conrad, or if they believed Mr. Martinez-Avina. And obviously they decided on the former because we're here. But also, with regards to the structure evidence, that's not the only thing. Obviously there was that profile evidence that came in. There was also evidence regarding the structure of drug trafficking organizations. It looks like he got nailed because he drove the dope across and he confessed. And the rest is just frosting on the cake. It was just a question of whether the jury believed him when he said, I didn't really mean to confess, I wouldn't have confessed, except they badgered me about my four-year-old son. Well, I don't believe they badgered him about his son. There was a video of his son on the cell phone. And while questions were being asked of him. And they played it. They played it. How could the business about the car keys and the air freshener amount to anything in a jury's eyes when they've got driving across with the dope and confessing? Because that was additional evidence that the jury, that the government put in, that the district court let the government put in, that weighed against what Mr. Martinez-Avina's account of the events of that day were. What was there that made it a close case, if anything? That made it a close case was the fact that the government witnesses' accounts at trial were impeached. There were critical points that they testified to at trial that were not in any reports. And even if this was a full confession case, the jury on this case was out for a good amount of time. It wasn't a quick verdict when they came back. This was a case where the jury had to do some deliberations to decide who to believe. How long did they keep them out? They were out overnight, Your Honor. They had believed they went out around 3 o'clock or 4 o'clock, and they came back the next morning. I think that they deliberated four to five hours, but I'm not sure. Good defense. Pardon me? Suggest good defense. Yes, Your Honor. And that goes to the next issue that I wanted to address. The next reason that the case should be reversed is the vouching that occurred in this case. Now, undoubtedly, the government will argue that it was only a – I didn't get the vouching. I didn't understand it. I understand vouching is when the government puts its own prestige behind the credibility of a witness, like telling the jury we wouldn't have put him on the stand if we didn't know he was telling the truth. And I didn't understand where they did something like that here. Well, that's understandable, Your Honor, because in all my endeavors to research, I didn't find any Ninth Circuit case that dealt explicitly with the situation we had here. I found U.S. v. Sanchez Lima, which I cited in my brief, in which one government witness was asked to comment on the veracity of another government witness. And I found United States v. Weatherspoon, in which the prosecutor made arguments during closing argument that were quite similar to the implied arguments that were made here. And so it's kind of a hybrid type of situation, something that I don't believe that the court has ever dealt with in a published opinion prior to this. The first question was, are you telling the truth? The objection for vouching was sustained. The prosecutor then, undaunted by the district court's sustaining that objection to vouching, basically asked the same question, do you have any reason to lie, which, again, was objected to. The district court then attempted to provide a curative instruction. However, the curative instruction is unintelligible and would be unintelligible to a layperson who's not an attorney and doesn't know the ins and outs of the vouching laws. That being the case... But don't you hear that question asked by defense counsel all the time on the other side? Are you telling the truth? Do you have any reason to lie? Isn't that a common question you hear on both sides in criminal cases? Sometimes it may be common to hear it from the defense counsel. However, the defense counsel doesn't have the procedure of the United States government behind it. But is he vouching when he asks that question? He is vouching because he's implying to the jury that he knows things that are not... No, he's just asking a witness who's been attacked if he's telling the truth. Isn't that a reasonable procedure? No, because they're prosecutors. Because they have the power of the United States government behind them. And when they do those types of things, they put the prestige of the United States government behind them. And they infer to the jury that the prosecutor knows the truth, the real truth, quote-unquote, and that maybe they know facts that aren't going to come into evidence. And the danger is that the jury, the ultimate job as a fact finder is taken away from the jury, and they're more likely to be influenced by the prosecutor. Okay, but the object... Now, skip that for a moment. So the objections were sustained, and the judge gave a curative instruction, which you say was unintelligible? Yes. Why is that? It was unintelligible because the judge said the exact words were something to the effect that you can't do, or a prosecutor, a government prosecutor can't do that. That's called vouching, and I'll supply the law for you, and that's what the law is. But nowhere was there any admonition for the jury to disregard those questions or to disregard the inference that the prosecutor had made, which was, I know that he's telling the truth because I'm the prosecutor, and I'm going to ask that question. And the error was then that the judge should have said that stricken from the record? Would that have cured it? At that time, she should... I don't think anything would have cured it at that point because of the fact that it was the government's first witness, and this is basically a case about credibility. This is a David and Goliath case about the credibility of a criminal defendant versus the credibility of the United States government. The United States government gets up there, and the first witness they put on, they bolster his credibility and imply to the jury that they knew, that he knows that the government witnesses are telling the truth. So that's why I made the motion for the mistrial, and that's why outside the presence of the jury, we addressed it with the district judge. I didn't ask for further curative instruction because I didn't think anything could cure it. I made the motion for the mistrial twice, and the motion for the mistrial was denied without prejudice by the district court. Your Honor, as I see that, I am or I'd like to reserve the rest of my time for rebuttal if possible. Thank you, counsel. Thank you. Counsel? May it please the Court. Marcel Stewart on behalf of the appellee of the United States. Your Honor, there was no impermissible structure evidence admitted in this case. Unlike the prior cases, Pineda, Valeo, in those cases, Beltran, in those cases, the prosecutor introduced significant evidence by way of expert testimony about a motor saparandai of a drug trafficking organization. Your Honor, in this case, that didn't happen here. There were some simple comments about the investigation that the agent undertook, but in no means was that an intent to introduce expert testimony. Well, he certainly inferred that a courier hangs an air freshener in his car, has, you know, just two minor, a few keys on the key chain. That was all unnecessary. Your Honors, I would agree that perhaps it was unrelevant, but the trial court made that decision to allow that evidence in. But the fact that it perhaps was unrelevant, Your Honors, does not necessarily mean that it's structure evidence, and the government will submit that, in fact, it is not structure evidence and not the type of structure evidence that has been found impermissible in previous cases. Is all there was that the expert put in and that's subjected to the car keys and the air freshener? The other statement that was made during the host Miranda interview, the agent stated to the defendant there are essentially two types of people. There are carriers and there are, what did he say, there are carriers and there are traffickers. Suppliers, I thought he said. I believe it may have been traffickers, but the record will be correct there, Your Honor. But essentially, in that situation, when the agent referred to that, the agent was doing no more than saying exactly what took place during the host Miranda interview. So, again, the agent was not seeking to introduce any type of impermissible structure evidence from which the juror should impute knowledge to the defendant, just simply what occurred in this case. But what's really important here, Your Honors, is that in Vallejo-Pena-Torres, what this Court found important was that the structure evidence was used really to provide a bridge in the absence of knowledge of information, direct information relating to knowledge. In this case, Your Honors, the prosecutor did not rely on structure evidence to create a bridge or fill a vacuum in the absence of significant evidence of knowledge. There were two agents who testified to the defendant's statements and confessions concerning knowledge in this case. So, in that way, Your Honor, again, this situation is vastly distinguishable from the prior cases cited by Villa-Pellant. Additionally, Your Honors, if you look at Vallejo and Pineda, what's further significant is I believe the Court found it determinative there that the prosecution had neither charged conspiracy nor was there evidence establishing a connection between the defendant and an additional organization or a larger group. In this case, there was significant evidence establishing a connection between the defendant and an additional organization. And that evidence came from the defendant's post-horanda confession that was testified to in court by Agent, I believe, Agent Conrad. And there, Agent Conrad detailed how the defendant stated that he was approached by an individual and recruited to drive this loaded vehicle. He detailed that he was taken there to where the vehicle was. He picked up the vehicle. He then was to transport the vehicle across the border. At that point, he was to leave the vehicle. Someone else then would come get the vehicle. And then at that point, he'd return to the vehicle and then take it back to Mexico. So there was significant evidence of a connection that this defendant was working with other individuals in a larger organization. And on that basis, Your Honors, I would suggest that this situation is vastly distinguishable from Pineda-Torres and Vallejo. Counsel, do I have this right? That agent's remark about there's a difference between a drug courier and a drug trafficker, if I got the record right, it's not that the agent was telling the jury, here's what mules look like, here's what traffickers look like. It's that he was using that to interrogate the defendant. And he said to the defendant during interrogation so that maybe he could elicit a confession that he was a mule, but nothing more than a mule. And then all he told the jury was, that's what I said to the defendant. Have I got it right, or was he also telling the jury about what mules look like and what traffickers look like? You're precisely correct, Your Honor. In this situation, it was nothing more than an investigative tool used during the interview. And so that came out in court. Essentially, what occurred during the interview? What did you say? What did the defendant say? So that account on the record, Your Honor, was no more than recounting what took place during the interview. It was not an attempt to try to sway the jury based on an extensive drug organization and the various roles that are played within a drug organization. So he was not presenting to the jury, here's what mules look like, here's what traffickers look like? Based on this record, Your Honor, I would submit that that is not the case. And the air freshener comment, was that made during the interview? No, the air freshener comment as well as the keys, that testimony came in when the prosecutor asked about basically why did you take pictures of these items? Why was it significant? So in that instance, Your Honors, it came in as part of the case, which is what the court indicated, and for that unlimited purpose only. Just to explain what the agent's actions were, why the agent chose to take pictures of those particular items, and really, Your Honors, no more than that. Was there something special in the pictures? I mean, if I saw one air freshener, I would think nothing of it. If I saw six of them hanging from the rear view mirror, I'd think either this guy's wife hates smoking or they've got a baby with dirty diapers. Was there something funny about the air fresheners? There was nothing funny, Your Honor, but the record is clear that the agent indicated that in the agent's experience, when vehicles have drugs in them, they often will have air fresheners. But here in this case, both the defense as well as the prosecution questioned the witness as to that issue, and there was extensive dialogue between the attorneys. But all the vehicles have internal combustion engines, too. Exactly. What was the special deal about air fresheners? I think, Your Honor, that there was no special deal, and I think that the jury can simply look at that and look at both the examination by the prosecution as well as by the defense and come to realization that, in fact, Your Honors, that having an air freshener in the car is not dispositive of whether an individual is a drug trafficker. But, Your Honors, here there was no harm. If the Court were to find that impermissible structural evidence was introduced, there is absolutely positively no harm in this case. There was extensive and overwhelming evidence of guilt. We've talked about the two agents who testified to the defendant's very extensive confession, very detailed confession. There was also evidence introduced that the defendant was the driver and the sole occupant of the vehicle containing the drugs. There was also evidence that the defendant indicated that the vehicle was his, yet that conflicted with the registration permit for the vehicle. The defendant stated that the vehicle was his for about three months, yet the registration contained another individual's name in it. So, Your Honors, the government will submit that there was no impermissible vouching excuse me, structural evidence, and this case is distinguishable on multiple levels from the prior cases, and there's no harm if this Court were to determine. Your Honors, with regard to vouching, no vouching occurred here. No vouching occurred here. Vouching occurs under this circuit's case law, where the government places its prestige, its prestige behind a witness and a witness's comments. That occurs in two ways generally, Your Honors. That occurs where, one, perhaps, the government may suggest that I know this witness is telling the truth. You can believe this witness, and that might suggest that the government has information that the jury doesn't have. The other way under the case law that this occurs, Your Honors, is where the government will ask of its witness to comment on the veracity of another witness. Those are the two basic ways when you'll find vouching under this circuit's case law. Neither one of those things occurred here. What occurred here was that the prosecution's witness was, his credibility was attacked by the defense on cross-examination. So, the prosecutor gets up and proceeds to rehabilitate that witness's credibility, and the prosecutor asks two questions, as we have here in the record. Are you telling the truth? Essentially, what's happening there is that the prosecutor's asking the witness, if anything, to comment as to his own credibility under the circumstance. And that, Your Honor, is no more than when a witness first takes the stand and swears under oath, I swear to tell the truth, the whole truth. The jury is going to look at that and recognize it's nothing more than a witness saying that, yes, I'm telling the truth. So why ask the question? Your Honor, I find that question to be ridiculous, really. What's the witness going to say? No, I'm lying? I wouldn't disagree with you that it was ridiculous, but I think that that underscores why the jury would disregard it. The jury would take it as a grain of salt. What witness is going to say on the stand? I'm really lying. I'm not telling the truth. In addition, Your Honor, the court gave extensive curative instructions. The first time, the court said, that's not permitted. You're instructed to disregard that. The court instructed the jury specifically to disregard that. Next, the court commented and gave a pretty scathing, scathing curative instruction. And later when the court addressed this very issue with counsel, discussing counsel's motion for a mistrial, the court noted that, what are we doing here? No, excuse me. The court noted, after the defense counsel moved for a mistrial, the court noted that it chastised the prosecutor, and I believe that the court did use that word before the jury, thereby obviating any potential harm. So the court intentionally gave a scathing curative instruction to obviate, and the prosecutor in that situation looked quite bad. And if anything, his position before the jury was undermined as opposed to improved. How did the defense manage to keep the jury out overnight in this case? It seems they caught the guy driving dope across the border and he confessed. Your Honor, I can't answer that, and particularly I was not the trial attorney. I know that. So the peculiarities, I don't know, but it does seem quite clear that there was strong evidence against this individual. What was the point of putting in, they put in this evidence about the air freshener. My reaction is, geez, I've had air fresheners on and off over the years, and it seems like a lot of the cars do in the parking lot. And then they put in the evidence about the car keys, and I'm thinking, each of my car keys is just one key on the key ring. They, in fact, said to do that at the car dealers. Why wouldn't all my house and office keys be on another key ring? And my guess is a whole lot of other people also have them on separate key rings and think the same way. And then they ask a cop whether he has reason or why. It just seemed, why were they doing this stuff? Maybe I don't understand the context of the trial or what was going on. I think, Your Honor, that there were some poor, at times, choices of questions that were asked to the witnesses. But there must have been some reason. Was there something at issue that I'm not catching? Your Honor, I don't believe that there was something at issue that we're not catching. But what I would agree, Your Honor, is that the agent, when testifying about why she took the pictures of the keys, why she took the picture of the air freshener, at that point, she was indicating through her mindset and her experience why she perceived it that way. And so in that sense and in that limited sense, there was some testimony concerning her investigative techniques. But beyond that, in terms of linking that to larger modus operandi and larger really drug courier evidence, that's not what really took place here. And again, I would encourage the Court to consider that in the prior decisions, Vallejo, Pineda, we're looking at situations where the prosecution really relies on that to fill really a vacuum and a void for knowledge, as well as this Court has found it significant that there was no connection, no connection between the defendant in those cases and a larger drug organization, whereas in this case, the defendant's own post-Miranda confession provided that connection, and that was introduced in court. Can I shift you for a few moments? Yes, Your Honor. To the sentencing issues that were raised here. One in particular, one of the arguments advanced was that the guideline, the advisory guideline range was treated by the district court judge as a presumptive sentence. Yes, Your Honor. And, you know, we have taken that issue on Bonnick and Zavala, and the Supreme Court is going to enlighten us about sentences within the guideline range, and I can't remember if it's either Cardi or the other one that the Court has. Should we wait to resolve that issue until we hear from the Supreme Court? I would think so, Your Honors. However, I would indicate that in this situation that the Court did not rely exclusively on the advisory guidelines, that, in fact, the Court proceeded properly by considering the advisory guidelines and then considering the other factors under 3553A. And in considering those factors, the Court also heard the, not the testimony, but the comments and the arguments of counsel concerning, of defense counsel concerning his client, his client's history. And the Court considered those things. And I believe that when you look at the record, that although the Court did consider, which the Court is required to do, the advisory guidelines, the Court in no way relied exclusively on those guidelines. And then, Your Honors, the fact that the Court chose to do it. Didn't she sentence on the base, on the bottom of the guideline, 27? The Court did sentence on the bottom of the guideline, finding that. Isn't that, my question is, isn't that pretty good evidence that the Court relied on the guidelines? I would suggest, Your Honor, that it's very good evidence that the Court found the guidelines reasonable under the totality of the consideration of the factors, that it found the guidelines reasonable. And that's permissible, Your Honor. It would be a different situation where the Court exclusively considered solely the guidelines, and on the basis of that rendered a decision, excuse me, imposed a sentence within the guideline range. Here, the Court expressly considers the other factors as well as the other arguments concerning counsel. But the simple fact that a court sentences within the guideline range, in and of itself, does not mean that the Court exclusively relied on the guidelines. Let me ask you another question on the sentencing issue. The other issue that they raised was the two-level enhancement for obstruction of justice. An issue there had to do with whether or not the district court made a finding of materiality. The government submits that, in fact, the district court did make a finding of materiality. And where the government points to, the government points to where the district court, again, speaking about, during sentencing, speaking about this very issue of defendant's testimony and recantation of his confession, stated that that went to a critical element. The government submits, Your Honor, that how else could ---- What was that element? It went to knowledge. It went to knowledge, Your Honor. And knowledge is a critical element of this case. And so they're looking at whether the defendant's testimony that the government ---- that the Court was considering was material, material meaning that it went to something significant in the case. The Court stated that it went to a critical element of the case. And then what I would encourage this Court to consider is if you're looking from a trial, from a trial judge's perspective, as he or she is conducting a sentencing hearing, please don't consider it in a very fragmented, compartmentalized type way. Because the trial judge is rendering or imposing sentence and delivering because of her rationale. And it may be that at one point during the rendering of that rationale, the Court will address an issue, and the Court may not necessarily think that five minutes later it necessarily has to readdress the same issue and make the same finding. But instead to consider the Court's rationale within the sentencing hearing as really continuous. And if you look to the Court's discussion about acceptance of responsibility, which is where you found the language of critical element, the Court there was really looking to, again, the defendant's statements, his recantation of his confession, which is what the Court was discussing when the Court was looking at the obstruction. So the Court's finding as to critical, that could not be read any other way. And the Court should not take a hyper-technical position to say that this Court, that the district courts must use the term material when, in fact, there could be no other way that that could be read. Was the change in the testimony about whether he had mints, whether he had C-enter? I'm sorry, Your Honor, could you repeat that, please? Was he confessed, as I understood it, that somebody hired him in a bar to drive the dope across the border for $1,000 or $2,000. And then he told a different story at trial. Was the story at the trial, I didn't know the dope was in the car? The story at the trial was that the confession was coerced. I know that, but what did he say about knowledge of the dope? He said that he didn't know that, in fact, the entire, that that entire confession that he provided was coerced. Whether he knew or not, as I understood it, that was the whole trial, whether he had C-enter, whether he knew the dope was in the car. Is that right? That's correct. That's correct, Your Honor. That's correct, Your Honor. But the court did give considerable attention during the sentencing analysis to the defendant's recantation of his testimony and found that it went to a critical, a critical element that could not be read any other way than material. Your Honor, another issue that I'd like to address briefly, and my time is about to toll here, is that I beg the Court's indulgence, Your Honor. Your Honor, I believe I've discussed all of the points. No, Your Honor, there is an important point. May I briefly Does she say in so many words, does the sentencing judge say in so many words that she knows she's not bound by the law? She knows she's not bound by the guidelines? Yes. The sentencing court, Judge, Your Honor, I beg the Court's indulgence, expressly indicated that the court was considering other factors, other 3553 factors. You mean this line, also taking into consideration the 3553A factors? Exactly, Your Honor, in imposing and rendering sentence. The last point, Your Honor, if I may just briefly say. The problem part here for us is it sounds like a pre-Booker sentence. She just goes through the guidelines calculations. But then she has this post-Booker language, taking into consideration 3553A factors. And I guess what I'm wondering is, is that enough to show that she's aware that the guidelines are merely advisory? Do we have a case that helps us decide that question? Do you know? I believe so, Your Honor. I believe that Garcia Garcia is instructive on that point, where the Court indicates that we assume that the district court knows and applies the law correctly. And, in fact, Your Honor, that that's something that's necessary. Well, in our case called Cardi, United States v. Cardi, the one that we took on Bonk, which is the companion to Zavala, the whole question is, what does the district court know about 3553A factors? In Cardi, the judge did just about what the judge did here. Again, Your Honors, I would suggest that, one, the Court expressly indicated that she was considering Let me ask you this. Did he raise any particular 3553A factors in his sentencing memorandum? Your Honor, at this time, I can't answer that question. I'm not prepared to answer that question at this time, Your Honor. But if I may lastly make this point about Thresha and other cases, Thresha and Sherpa, bearing on the safety valve issue, what I'd like to make the point there, Your Honors, is that this Court did not find that, excuse me, Your Honor, that this Court did not find there, in those cases where the defendant in Thresha made a confession, recanted the confession, and then he was convicted. And at sentencing, the trial court gave the defendant safety valve. This Court affirmed that. But in that case, this Court did not decide that any time a defendant gives a confession and then later recants it, that the Court must give or shall give safety valve relief. That's right. That you leave, this Court has left discretion to the Court to look at credibility of the witness, to look at the information in the context of the trial. And I would urge this Court to not pass a rule that would restrict the judgment. The judge simply, what she said here was that she determined that he had not made a complete and truthful statement about the incident. Well, in addition, this Court, the district court did find that it was willful, that the defendant's statements were willful. And then we've already talked about critical. But what I would suggest to this Court is not to pass a rule that would restrict the district courts under these circumstances where a defendant provides a post-Miranda confession and later takes away that confession. And again, Your Honor, if we look at the equity of the case. Well, the point of the rule is that it has to be a full and complete statement to the district court or to the government about the defendant's knowledge of the crime. It doesn't make any difference whether he changes his story, but by the time sentencing, he's got to give a full and complete, you know, proffer of his knowledge of the crime. And, you know, here she said he didn't. That seems to me to be pretty solid. And as well as truthful. And by recanting it in this situation, he compounded the issue by calling into question that as well. Unless Your Honors have any more questions. Thank you, Counsel. Thank you, Your Honors. Your Honors, just to address the points brought up by opposing counsel for the government. First of all, what the cases like Vallejo or Rio say is that most operandi evidence of drug trafficking organizations should not come into evidence in a non-complex, simple border bus case where there's no lack of a fingerprint defense presented. Now, in this case, it was, and it's not a conspiracy case. In this case, it was not charged as a conspiracy. It was a simple, non-complex border bus. The government endeavors to squeeze from the record that there was other evidence of some huge drug trafficking organization that the defendant himself provided. The defendant told Agent Conrad the day he was arrested that he, it was his friend Francisco Javier's car. There's one person involved here that the defendant told the government about. He didn't say Francisco Javier has a huge drug trafficking organization and he asked me to be a part of it. Okay? So that is inaccurate. Now, with regards to whether or not the pictures of the air freshener and the keys should come in as quote, unquote, part of the case, it's simply not relevant to show anything unless it's to impute knowledge to the defendant. And that being the case, this court has held many times that that is impermissible in these types of cases. Now, I think that I should clarify for the panel what the facts of the case exactly were. The facts of the case were that Mr. Martinez-Avena was arrested. He was Mirandized. Agent Conrad began to question him. He told Agent Conrad everything that happened. What caught their attention at the border? At the border, well, the primary officer said that because his name wasn't on the registration, and at trial he testified that Mr. Martinez was acting out of the ordinary. However, that was part of the first vouching debacle was trial counsel impeached Officer Morris regarding, you know, the fact that that was nowhere in any of his reports that Mr. Martinez was acting out of the ordinary or anything of that nature, and he admitted that it wasn't. So at any rate, he got sent to secondary. It was probably, you know, the real answer is probably because his name wasn't on the registration. So they probably sent him to secondary, but that's speculation on my part. Mr. Martinez said the same thing the day he was arrested and at trial. The only difference between what he said was at trial he explained that he had, that he did not have knowledge, that he had said he had knowledge to make the agent stop questioning him at that point. He said he said the same thing in questioning in a trial, but I thought in questioning he said I knew there was dope in there, and at trial he said I did not know there was dope in there, and that was the only thing at issue in the case. Yeah, exactly, Your Honor. That's the only difference. It's a difference. It is a difference. It's an element of the crime. It is a difference, Your Honor, but the thing about it is that the panel seemed, during the government's argument, It's a difference between guilty and innocent. Yeah, but the panel seemed to be, the impression to me was that he recanted everything at trial. That's not true. He said the same thing except for guilt or innocence. Now, with regards to Justice Kleinfeld's question about why the jury stayed out so long, it's because the government witnesses in this case, their credibility was severely undermined. Every single one of them. Officer Morris's credibility was undermined. I'm thinking that far from prejudicing the defendant, some of this nonsense about the air fresheners and the keys prejudiced the prosecution, and the jury wondered why are they giving us all this silliness. It didn't, Your Honor. It served to bolster the government's case to show that these seemingly innocent acts were actually indicative of what a drug courier would do. All the jurors were born yesterday? No, Your Honor. This is the, I'm almost about to run out of time. May I continue to answer your question, Your Honor? When, if that was the only testimony from the lay person that got up there on the stand and said to the jury, he had an air freshener and he had keys on, two keys on the key ring, so he must have been smuggling drugs, okay, then Your Honor would be exactly correct. That would seem absurd and it would actually probably hurt the government's case. But the problem in this case is that particularly Officer Cervantes was up there on the stand and said many times, to the jury, in my training and experience, this type of activity is indicative of drug couriers. This type of activity is indicative of somebody who has drugs in the car. And at that point, that's the major issue that we have here with Leo, with the drug courier profile and the modus operandi of drug courier testimony, is that exactly what the court has a problem with. Justice Kleinfeld, you don't like the fact that these seem like totally innocuous things. And that's the problem, is that these totally innocuous things, by the use of this testimony from Officer Cervantes, served to become evidence of guilt. And that's the major problem with how the structured testimony affected the trial and the error wasn't harmless. I thank the panel for its time. Thank you, counsel. United States versus Martinez-Avena is submitted. I don't have another one here. I think it's mine. Next is Wilkins versus United States.
judges: Kleinfeld, Paez, Hart